The counsel-Jbr the defendants filed the following petition for a re-hearing:

The opinion delivered seems to have been written ‘under an impression, that Thompson had experienced a want of liberality from the complainants, in thepro-3ecution of their suit in the circuit court, although not in a degree sufficient to justify the controling power of this honorable court. This would not be the proper subject of remonstrance we are prepared to acknowledge; and however the complainants would regret to incur the censure, which honorable minds must always attach to the rigid exaction of strict right, and especially toward one who had been numbered by their deceased father among his friends, and who had occupied the station of trustee toward themselves; still we would remain silent, as our duty dictated, did we not believe, that in reversing this volumnious record, circumstances important to the inte>'ests of their clients had been overlooked, and that essential injury had consequently resulted to them.
They would however avail themselves of this opportunity to say, that the complainants -commenced and long prosecuted their suit without an unkind feeling toward Mr. Thompson, or an apprehension that he had attempted or was capable of doing them injustice. They knew but little of the condition of the affairs of their father at his death, or the sales of 1-805, and they confided in the integrity of Thompson. But -they knew that Gatewood had received-large sums at future periods, from the farm, and the slaves and. •stock remaining upon it; they were ig oraut of the payment of those sums to Thompson, and really ex- ‘ *106 pected a recovery against him. It was not until the fall of 1823, when Thompson’s account was rendered, end which they were almost prepared to pass without scrutiny, that they ascertained that Gatewood had in fact paid to him; and that he had endeavored to defraud them, by fabricating vouchers and altering to an extent not only immoral, but even ^criminal in law. Erasures and alíerations, and, as we apprehend, even forgeries, become apparent.
Petitiion for a re-hearing.
These documents have not been presented to this court, because the commissioners passed upon them, and no exception having been taken to theirsentence, they remain with the vouchers in the circuit court; but we apprehend they are subject to the order of this court, when they may be calculated to shed light upon any branch of the cause.
It is true, that Mr. Thompson was immediately at-•tacked by a paralysis, which, for a while, entitled him to indulgence; but he soon became competent to advise and concert his defence; he accordingly employed counsel and agents, and almost a year longer was afforded him to make preparation. Nor was a hearing urged until he sold all his property and fled the country. Nor then, whilst his active partizans and agents, Salsiinstall and Quarles, could make out cause -for a continuance.
The complainants did become apprehensive that they were to suffer by Thompson, and they found it necessary, when they found that the time, which had been conceded to his afflictions, had been devoted to the sale and smuggling of his property, and, his escape, to'insist on a hearing. Yet they do flatter themselves, that none who read the affidavit of Salstin-stall, upon which the last application for a continuance was founded, will say that there is reason to believe that Thompson was deprived of any proof, or sustained any injustice for that cause. Their opinion of Gatewood was likewise of course changed, and they were not unwilling to confess it, and they do not think that, therefore,collusion between them and Gate-wood should be imputed.
On the subjpct.of interest, we would respectfully suggest, that vouchers have escaped the attention of *107 ibe eo&rt, which, agreeably to all rule applicable to such subjects, renders the executor or other trustee liable for interest.
Petition (or ft re-hearing.
It will be recollected that the sale took place in the year 1805, upon a credit of twelve months. In 1806 then, most probably, the executor Thompson had funds sufficient to pay every debt due from his testator. Or if the money was not actually in hand for every purpose, the residue bore interest, yet he renders no account for interest collected upon the notes at the sale. If he acted honestly in this, we must say that the money was promptly paid him. It then became Thompson’s duty, forthwith to discharge the debts. The creditors had a righl to expect it,and the heirs were interested in it Yethe baffled the creditors. He postponed; paid small sums,gave small orders; imposed pieces of property upon creditors; still permitting the demands to run upon interest, even from 1806 till 1815. See, for example, the case of Hoskins. These creditors had a right to their money, without prevarication or delay; they had a right to it without a bond of indemnity, and they demanded it accordingly. But Thompson’s own account shows how they were baffled. What answer may we suppose Thompson gave to Hoskins’ requisition for money, when he indpeed him to take an order upon Peter Gatewood for a small sum in money? or when he prevailed upon him to receive a horse, which he could purchase from Mr. Garth, and which he did purchase at $>200, and upon which, by the bye, he paid two years’ interest? What apology must we suppose Thompson'could give, or did give, to honest creditors for the disappointments to which he subjected them? The answer is obvious. He had no money of the estate. No other excuse can be presumed. We a/k, why had he no money? And here but one answer occurs. He had used the funds of the estate; he had applied them to his own use. Taking however the reasoning of the opinion, upon the fact of the advancement by Gatewood, in 1815, to pay debts, and our right to interest must follow, as we presume, conclusively; from the fact,that in September 1806, and from that time, at different periods, up to 1815, Thompson drew upon Gatewood for money to pay the debts. Gatewood paid to Hos-kins, upon the voucher of Thompson, in 1806, the sum *108 of $300; he paid to Ship the sum of $200 in the same year; and thus fortu, insomuch that it would really seem that _r. Thompson, of the proceeds of the sales ofl805. never found it convenient to pay the debts of his testator, but sfili protracted them until the profits of the farm, and slaves, in possession of Gatewood, enabled him to draw on that fund. Why do we dwell? If the receipt of money from Gatewoody in 1815, to-pay debt«, would justify the inference, that Thompson had perverted the means of I 805 to his own use, a similar transaction of 1806 must justify a similar conclusion. Because then, the executor having the-means to pay debts, neglected and refused to do so, and permitted interest to accrue; and because,in fact, he used the money; for one or both of those reasons, certainly he should be charged with thatinterest. Or if he could not, or did not, collect in reasonable time, still he must have collected with interest; for the purchasers are not returned insolvent, and to charge him with interest fairly balances the account. To tho accounts of Thompson in the first record, page 73, and to that of Gatewood in the same record, we refer as unquestionably sustaining us in the-facts upon which these remaiks are predicated. Even Mr. Thompson happens to prove by Col. Quarles, that Hoskins was unfriendly to him, and complained of ill treatment, by refusing so long to pay bis father’s debt.
Petition fot a ra-hearing.
In relation to the combination of Quarles and Thompson, the counsel labor under greater difficulty, because they are very conscious, that the circumstances which would be conclusive in some minds, would not he sufficient with others. Thus the predecessors of this honorable court, in overruling' a motion of Quarles, for supersedeas, pronounced it the most palpable case of fraud which had-ever been presented to them. Whilst with this honorable court, it is not. quite sufficient. We would be excused repeating some circumstances which seem to have been preter-mitted, and in a doubtful case we apprehend would turn the scale.. Permit us however to say, that we would presume the answer of Thompson could avail but little, for the transaction as regards him is, of necessity, almost pronounced by this court to be fraudulent, and ho swears, as broadly his own innocence as that of Quarles. He even ventures to <*eny any just *109 responsibility to Sanders’ heirs, notwithstanding the criminal means to which he resorted, to evade their action. And concerning Mr. Salstinstall, relative to whose character the record contains no proof, we believe he can with no pretence claim a standing above mediocrity. He is the man who, in October, swore, on a motion for a continuance, that his John Thompson, the persecution of \yhom had certainly excited his sympathy, had only went to Green river on a visit, although in point of fact he had, before he left this quarter, sold off all his visible estate except what he took with him, .and had moved with all his family and effects in the summer preceding. Mr. Salstinstall however only proves, that at the execution of the note, $4,800 were counted down, and f!200whicli had been previously loaned, wasincluded.
Petition tor a. re*lleannS
Roger Quarles had been selected as the prime agent for Thompson, from the time of his affliction; a complaint which renders the mind as inactive as-any other, which does not derange our faculties. Quarles becomes an active agent, attending at Paris, Mountsterling, Fayette, Jessamine, Woodford, Mercer, and Scott, in taking depositions and obtaining documents. He makes all the advances; attends the courts; employs counsel; pays the fees to the amount of many hundreds; and when he can obtain no further procrastination, lie caused an appeal to be prayed, and himself to be named as the security, and thus suspends the process, and paralyzes the complainants thirty days longer, but takes care not to execute the bond. It may therefore be very well said, as in the opinion, that “he assisted Salstinstall in some agency in the business of Thompson, during his disability. He knew of the pendency of the suit against Thomp - son, as executor of Sanders, and it ought not to be doubted that he knew of the report,” and its tenor, &c. Nay, may it not be said, that Quarles was not merely an assistant of Salstinstall, but the chief agent; that he understood perfectly the nature of the contro-troversy, and the dangeis surrounding Thompson. With a superficial knowledge of the case, all this parade from county to county, taking depositions and procuring evidences, would have been idle in the extreme. He even had his own deposition taken, on the subject of the greatest controversy betwc *110 parties. With this full knowledge, a -d in the full exercise of this agency, on the part of Quarles, it is re* solved, that Thompson must sell off all his property and leave the country, or rather, this quarter of Ken* tacky. Now, Thompson’s mind has become inactive and dull, whe suggests this plan of escape? Is it him- or rather some other person? and| if another, who more probably than Quarles? if it were his own in-' vention, has he vigor of intellect to plan, to resolve,. and to carry it into effect, without referring to one-friend for advice and cooperation? and who that friend, but Quarles? Yes, Quarles is to lend him a large sum of money. Why does this palsied and infirm old man want money? Would not Quarles ask, and would not Thompson confide in him? For what did Thompson borrow this money? To prepare to pay off Sanders? But there is no decree: this is April, and no decree till October. Would it not have been more prudent to permit the money to remain in the hands of Quarles, until the time should come that Thompson would be willing or bound to. pay? A loan six months in advance! and that loan payable upon demand!! This were taking of time by the fore-lock. Did all this occur to Thompson’s impaired faculties, and did Quarles believe in it? Surely it was impossible. No, Quarles don’t deal upon this subject as a real transaction. Suppose that gen-' fieman to have commenced this life a mechanic, a carpenter by trade, without a patrimony, and that he has acquired, by his industry and attention to his means, not only a competency but affluence, can it be believed that such a man, or any other man in Kentucky, who. possesses sufficient intellect to give testimony as a witness, would lend his thousands, and employ counsel to prepare a mortgage to secure it, yet would not enquire what was. the estate contained in the mortgage? Five thousand dollars was a large sum of money; and if we were to" depart from the record, we would not believe that Quarles, had at that time one-half the amount in hand, even in Commonwealth. We think the Colonel kept his means more actively employed, and to much greater profit. And accordingly he says, that it was money loaned at different times. We do not refer to his deposition, in '¡bis respect, as evidence of the truth, for his answer *111 4s evidently evasive; but he saw the absurdity of male-ing one great loan of it; and being asked by the a m plainant, “in what year or month did you loan him money,and how much?” He says, “I lent him some money this year, arid some money some years ago, when he and Salstinstall were in a push; we had a settlement not long ago, it is all included in the Mr. Salstinstall’s version reads, “two hundred dollars loaned Thompson in the winter of 1824, and $4,800 on the day of giving the note.” This gives us the precise sum in a simple transaction, except that the interest on the $200 is lost. Quarles would have it in part old transactions, now settled and liquidated, and more modern ones. The latter we would think much the more probable tale; but strange, that upon a settlement of various important transactions by loan, the round sum of$5,000 should be produced! This has, we must insist, too artificial an aspect for real matters of business. And it is passing strange, that the note and mortgage too should omit to show in what the currency, for the attention of all society had been drawn to such subjects! and that, in giving his deposition, Colonel Quarles forgot to state that, in fact, it was a Commonwealth transaction. This suppression perhaps could most rationally be accounted for, by the fact, that money being two for one, the demand on Chambers and Smith more than paid CoL Quarles, and, of course, some of the mortgaged property would have been liable. Accordingly Colonel Quarles, in his first transactions with Chambers, spoke of it as a specie debt; and we apprehend it never would have been reduced to Commonwealth, had it not been foreseen, that no body would believe the Colonel had $5,000 in specie in his desk at that time. Snbsequently however they all concur in this, that it was a Commonwealth transaction, and substantially paid on the very day and before the mortgage was executed. Why then was the mortgage made by Thompson to Quarles, even if there had been such a loan? They say, that they could not anticipate the depreciation. Of what concern was it to anticipate the depreciation? The $2,500 to be paid by Smith, .was worth the principal, the $5,000, loaned in C°m-.mon wealth. And the $295 to be paid by Chambers, exceeded all the interest which could run from the' *112 time of the loan, until Smith’s notes should attain ms-tui'ity. Why then was the mortgage given? Cham-hers understood the loan was in specie, and he could very well suppose the propriety of a mortgage to se-care balance. But as the circumstances are now explained, one apology alone remains; this note was retained and the mortgage was given, to cover the es-late of Thompson Irom the decree, ihen expected by a¡| concerned, in favor of Sanders’ heirs. The mortgage was a parcel only oí the same fraudulent and delusive -combination which induced a sale of all the estate ol Thompson. Trie assignment of the chases in action was but another portion of the same device; and the transfer of Smith and Chambers’ notes fraudulent and void. As this mortgage, was but coloura-ble, Col. Quarles permitted Col. Thompson to take with him (o Christian county, one of the-men mortgaged. But mark how different his conduct when the transactions become real. He bad advanced monies for Thompson in the defence of the suit, and he claimed one hundred dollars for his services. He felt no interest in this mortgage, and submitted it to Thompson and the lawyer to put in it what pleased them, it should receive his fiat. He therefore soon forgot the land on Cedar. But when he really advances, how is it? Nothing escapes. Thus his estate was accumulated. Now ho acts an efficient part, Colonel Quarles in true character. He does not rely upon the mortgage lo justify the sale of the other slave. He retains him for his indemnity, and when he closes his agency, he obtains an authority, by letter from Thompson, to sell the boy and satisfy himself. Thus the mortgage has, by consent of the parties, evaporated.
Petition for a rc-heanng.
Petition fora re'hearing,
Fe.ition ior a -.-e-hearing.
It is painful to press this subject, for reasons too obvious. We have endeavored to identify this mortgage and the'transfer 01 Smith’s notes. Once more, however, as to the sale of the land. Who would Thompson most probably call upon to assist in the sale of his property? -His attorney, Quarles, his intelligent adviser and active agent. Accordingly, Quarles proposes it to Chambers, and throughout the negotiation, Quarles is about, suggests terms, and Thompson unifies. The proceeds of sales of other property is applied to other debts, and they are ail *113 paid or secured by obligations from the purchasers to the creditors. So it was with Stephenson’s purchase. Where money in hand can be obtained, Thompson receives it, as in the case of Hawkins. But a portion of the land must be sold on credit. Plow may this be arranged? By assignment to Quarles; a creditor whom Mr. Thompson had forgotten, when he undertook to point out all his debts to Stevenson; a creditor who, we think, we haVe shown had bul a pretence to the character. But if Colonel Quarles can pass as a Creditor of Thompson, until he can collect and remit.the money, all will be well. Pie is therefore a creditor by loan, but. he submits it, as in the case of the mortgage, entirely to Mr. Thompson and Mr. Robinson, to arrange the assignments, and custody too of the notes of Smith and Chambers; for sums sufficient to satisfy him in all conscience; and thenceforth, he never thinks or inquires, what is done? wheré are these notes, until Sanders; in taking his deposition some months afterwards, calls his attention to them? And, like the Cedar lands, as Brenham expressly swears, he did not know that they were assigned to him, aná would have denied it upon his oath, had not Mr. Robinson reminded him of the fact; Then, th'eland and the notes are all his.
Petition lor a re-hearing.-
We have endeavored to maintain, that the loan by :Quarles to P’bompson was but a pretence, and that the assignment of the notes of Smith and Chambers and the mortgage, but colorable; and will detain this court with but few further remarks.
The opinion supposes, that Quarles really understood Thompson as selling off his property to make provision for (his debt, and not to defraud the complainants. This we have aíso éndeavored-to show, is conceived in too great charity. ' But it is said, that Chambers and others so supposed for a while; Thev did so believe for a while; it is true, for they are not in the confidence of Thompson. They however soon had cause to Suspect the contrary. How is it with Quarles? Pie is asked if he knows of any provision being made by Thompson, to pay their demand, and what is his answer? He knows of none. Were these $6,000 lent for that purpose? Then, why did not the witness answer, that he so understood it? No. He *114 is content with a simple negative. Thompson he knew had sold every thing. He aided him in it. Thompson he knew did not borrow from him $5,000; or if lie did so borrow, he had no expectation that it was for the purpose of paying the complainants. Otherwise he would have said it; truth and candor required it of him. He saw the whole estate, as he believed, put beyond the reach of the complainants. He saw provision made for every other creditor. He •participated in those measures, and could not have misunderstood the purpose. We therefore would once more repeat, that we have a confidence that, if it shall not be too troublesome for this honorable court to revise this protracted record, they will finally pronounce the case of Quarles, condemned by more evidences of fraudulent arrangement, agreeably tp the rules found in the books, and those evidences more strongly fortified by corroborating circumstances, than any which has heretofore received the denunciation •of this honorable court.
Response.
They therefore respectfully solicit a re-hearing.